# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

EDWARD MCDONALD,         )
)
    Plaintiff,           )
)       **NO. 3:22-cv-00514**
v.                     )
)       **JUDGE CAMPBELL**
METROPOLITAN NASHVILLE    )       **MAGISTRATE JUDGE FRENSLEY**
AIRPORT AUTHORITY,        )
)
    Defendant.         )

## MEMORANDUM

Plaintiff Edward McDonald worked for Defendant Metropolitan Nashville Airport Authority ("MNAA") as its Assistant Vice President ("AVP") of Risk Management for approximately eighteen months from April 2019 to October 2020. He claims MNAA discriminated against him because he is black and then retaliated against him when he complained of race discrimination and sought leave under the Family and Medical Leave Act. Plaintiff filed this lawsuit bringing claims of race discrimination, hostile work environment, retaliation, and retaliatory hostile work environment under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000(e) *et seq.,* the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101 *et seq.*, and 42 U.S.C. § 1981 ("Section 1981). He also brings a retaliation claim under the Family and Medical Leave Act, 29 U.S.C. § 2601.

MNAA seeks summary judgment. (Doc. No. 33). In support of the Motion, MNAA filed a memorandum of law (Doc. No. 34) and statement of undisputed material facts (Doc. No. 35). Plaintiff filed a response to MNAA's motion and statement of undisputed material facts (Doc. Nos. 36, 39) and filed a statement of additional material facts (Doc. No. 40). Defendant responded to Plaintiff's additional material facts (Doc. No. 47) and filed a reply (Doc. No. 46).

For the reasons stated herein, Defendant's motion for summary judgment will be **DENIED**.

# I.        BACKGROUND[1]

MNAA manages Nashville, Tennessee's airport systems, which include the John C. Tune Airport and Nashville International Airport. (Def. SOF ¶ 1). In April 2019, Plaintiff began working for MNAA as the Assistant Vice President ("AVP") of Risk Management. (*Id*. ¶ 6). In this role, Plaintiff was responsible for overseeing the risk management programs for MNAA, which included making claims, enterprise risk management, business continuity and support, and development of the safety management system. (*Id*. ¶ 7).

Until June 2019, Plaintiff reported directly to MNAA General Counsel Doug Sloan and then, after Sloan's departure, to MNAA CEO Doug Kreulen. (*Id*. ¶¶ 8, 10; Pl. SOF ¶¶ 9, 10). In September 2019, he began reporting to MNAA Chief Administrative Officer Gale LaRoche. (Def. SOF ¶ 12; Pl. SOF ¶ 11). Plaintiff is black. (Def. SOF ¶ 5). LaRoche and Kreulen are white. (Pl. SOF ¶ 47). Four employees, including Plaintiff, reported directly to LaRoche – all of LaRoche's direct reports were black. (Def. SOF ¶¶ 13-17).

---

[1]        For ease of reference, the Court uses cites to certain portions of the record as follows:

Defendant's Statement of Undisputed Material Facts, together with Plaintiff's response (Doc. No. 39), is cited at "Def. SOF ¶ ___" and Plaintiff's Statement of Additional Undisputed Material Facts, together with MNAA's response (Doc. No. 47), is cited as "Pl. SOF ¶ ___."

Plaintiff's Declaration (Doc. No. 41-1) is cited as "Pl. Decl. ¶ ___."

All deposition testimony is cited as "[Last Name] Dep. at [page number]." Deposition testimony is filed in the record as follows: Plaintiff Edward McDonale, Doc. No. 41-2, 47-1; Doug Kreulan, Doc. No. 35-1, 41-3, 47-3; Gale LaRoche (Day 1), Doc. No. 35-5, 41-4, 47-5; Gale LaRoche (Day 2), Doc. No. 35-6, 41-8; Chandra Starks, Doc. No. 35-7, 41-5; Karisse Spray, Doc. No. 35-8, 41-6, 47-2; Robert Davidson, Doc. No. 35-9, 41-7, 47-6.

Beginning no later than the fall of 2019, Kreulen and LaRoche discussed concerns with Plaintiff about the quality of his work and his compliance with MNAA's attendance and remote work policy. (Pl. Dep. at 69, 71-72, 87-88; LaRoche Dep. at 138-39; Def. SOF ¶¶ 18, 19). He was not issued a written reprimand and his performance evaluation in January 2020 did not raise any concerns about his performance. (*See* Pl. SOF ¶ 15; Doc. No. 41-10). In fact, the evaluation stated that Plaintiff met expectations in core values, was on track for personal objectives, and overall was "do[ing] an outstanding job in the risk management area and [was] helping to move the organization." (Doc. No. 41-10 at PageID# 1394-95).  In the area for supervisor comments and recommendations, LaRoche wrote:

> Ed is a very professional risk leader. He is always working to improve his knowledge and to share knowledge with others. He has completed the basic request of the basic inventory of insurance and present all of our lines of coverage so that we an understanding of what we have and what may need [sic]. Ed is ready to move forward with the development of the framework for Enterprise Risk Management, Business Continuity Management and Safety Management as a part of BNA's organizational resiliance [sic].

(*Id*. at PageID# 1395).

Plaintiff, however, had concerns about the way he was treated by MNAA management and felt that LaRoche was discriminating against him. (Pl. Dep. at 100). He states that he raised these concerns to Karisse Spray, AVP of Human Resources, in late January or early February 2020.[2] (*Id*.). Plaintiff told Spray that he was: "(1) being disparately instructed to limit [his] remote work; (2) being told by MNAA that [he] could not attend Board Meetings unless presenting, while white professional peers [including Traci Holton] could attend Board Meetings without restriction; (3) being repeatedly denied requests for additional staff and support, while [his] white professional

---

[2] For purposes of summary judgment Plaintiff's version of events is accepted. However, Spray testified that she did not recall the conversation with Plaintiff. (Spray Dep. at 152-56).

peers received staff and resources from MNAA; and (4) being micromanaged and spoken to by LaRoche and Kreulen in a condescending, hostile, and negative manner that was less favorable than treatment towards my white professional peers." (Pl. Decl. ¶ 19). Plaintiff also "shared [his] belief that MNAA has 'a lot of leadership issues' and is a work environment that is 'not racially friendly.'" (*Id*.). Spray said that she would talk to LaRoche. (*Id*. ¶ 20).

On February 6 or 7, 2020, about a week after his conversation with Spray, LaRoche issued Plaintiff a written reprimand regarding "Work and Attendance Issues."[3] (Def. SOF ¶ 21; Doc. No. 41-12). The reprimand raised concerns regarding Plaintiff's attendance, including concerns she raised during the fall and an additional attendance issue on January 10, 2020. (Doc. No. 41-12). In the reprimand, LaRoche acknowledges that she recently gave Plaintiff a good performance evaluation "because you do have good skills and you are very knowledgeable in your field." (*Id*.). The letter states, "I've noticed that you are out of the office frequently with ACRP, conferences, and other activities – those activities should be reduced until you get a handle on your workload" and added that there would be "no consideration for additional staff" "until I see that you are giving your work 100% of effort." (*Id*.). LaRoche noted that Plaintiff had asked for approval for him to serve on the board of an organization and stated, "I do not feel that I can approve you taking additional time off work to serve on that board when we have so much to accomplish here." (*Id*.).

In addition to attendance concerns, the reprimand identified two performance issues: (1) that Plaintiff was "unprepared for our budget meeting with Finance"; and (2) that Plaintiff submitted a staff analysis "to be shared with the President and CEO and Board that had information

---

[3]    The Memorandum is dated February 6, 2020, but signed by LaRoche and Plaintiff on February 7, 2020. (*See* Doc. No. 41-12). Although the Memorandum itself references a February 6, 2020, meeting, Plaintiff states that she "handed it to [him]" during the meeting. (*Id*.; Pl. Dep. at 97-98). Plaintiff states the Memorandum reflects the discussion that took place during the meeting on February 6 or 7, 2020. (Pl. Dep. at 95).

4

and data that did not match between the two charts on the analysis." (*Id*.). The reprimand letter concluded: "Your failure to positively address the attendance issue and other noted issues will result in further disciplinary actions, including termination of employment with the MNAA. I am concerned about your lack of accepting any accountability for your actions displayed during our meeting on February 6, 2020. I am expecting to see immediate and demonstrable improvements in your performance." (*Id*.).

Plaintiff responded to the reprimand in writing on March 9, 2020. (Def. SOF ¶ 23; Pl. SOF ¶ 72; Doc. No. 41-14). The first four and a half pages of the single-spaced response addressed each of the issues raised in the letter of reprimand. (*See* Doc. No. 41-14; Pl. SOF ¶ 73). Plaintiff then expressed dissatisfaction concerning his conditions of employment and treatment. (Pl. SOF ¶ 74). Specifically, after complaining that MNAA denied his repeated requests for additional staff, Plaintiff stated:

> The fact that I am being reprimanded regarding the content presented, I believe has created unfair and inequitable opportunities to be successful and perform at a high level by this organization. Having my character as a professional slandered, questioning my integrity, and attempting to hold me accountable to baseless accusations without having a conversation with me prior to this level of confrontation, I find myself in a corner. … I feel that if I do not accept accountability for these allegations, as Gale stated, I will face further disciplinary action, including termination. This matter has led me to believe I will receive retaliation from Gale at some point in the near future and uncomfortable to perform my job.

(Doc. No. 41-14 at 5). The response letter also complained that Plaintiff was not receiving "support from the organization" while "[his] peers get all the support and resources they need to perform[.]" (*Id*. at 6).  He wrote, "The optics are obvious. The inequities are visible." (*Id*.). He concluded, "While I will continue to do my job at a high level, I do not feel the organization has provided me any support to be successful or the tools I need to be efficient and effective. That lack of support

5

has been damaging to my image, my character, and my career. I worry that my tenure with this organization will be cut short if this is how I will be treated and unsupported." (*Id.* at 6-7).

After LaRoche received Plaintiff's response, a follow-up meeting was held. (Pl. SOF ¶ 41). At the meeting, Plaintiff went over the points in his written response, and "expressed that [he] felt like there were some hostilities, and … that it was due to race and that [he] felt like [he] was being discriminated against." (Pl. Dep. at 110). LaRoche became visibly upset and said, "I take offense … it sounds like you are calling me a racist."[4] (*Id.*).

Plaintiff states that for the next six months, LaRoche and others at MNAA subjected him to "disparate treatment, hostile in-person and electronic communications during daily interactions, disparate job scrutiny and concocted criticisms [including undue criticism regarding an 'outside employment' form], and other adverse forms of treatment [including an undeservedly lower job performance evaluation in June 2020]." (Pl. Decl. ¶ 44).

In April or May 2020, MNAA requested Plaintiff provide information about a consulting company Plaintiff owned with his wife. (Def. SOF ¶¶ 24-28). After Plaintiff responded, MNAA's legal department asked for more information. (*Id.* ¶¶ 30-31). After some back and forth, MNAA's legal counsel viewed Plaintiff's response as incomplete. (*Id.* ¶ 31). Kreulen then sent Plaintiff a letter via email stating that he concurred with that assessment. (*See* Doc. No. 35-2, Ex. 6). Plaintiff responded to Kreulen's letter with a four-page, single-spaced memorandum addressing each point raised in the letter. (*Id.*, Ex. 7). Kreulen found the tone of Plaintiff's response "more troubling than the absence of a complete response to [MNAA's] request for possible conflict of interest information." (*Id.*, Ex. 8). Kreulen wrote that Plaintiff's "insistence on taking a point/counterpoint

---

[4]    For purposes of summary judgment Plaintiff's version of events is accepted. However, LaRoche denies ever saying making such a comment. (LaRoche Dep. at 87).

argumentative approach to reasonable communications rather than simply complying with an appropriate request is troubling." (*Id*.). Kreulen met with Plaintiff in June 2020 and told Plaintiff he needed to listen to the expectations set by LaRoche and meet those expectations. (Def. SOF ¶¶ 35, 38).

Later in June 2020, Plaintiff received an end of fiscal year performance report from LaRoche. (Def. SOF ¶¶ 39, 40). Plaintiff received an overall evaluation of 3.2 out of 5. (*See* Doc. No. 35-4). LaRoche noted in the area of communication that "Ed is an effective communicator, but often waits for others to reach out to him. He should actively communicate with other[s.]" (*Id*.). Plaintiff's response to the ethics form was one example of a communications problem. (*Id*.). The review also noted that there was a "last chance letter in the file for Ed" and that they had "moved on from that." (*Id*.).  Plaintiff responded that he "appreciate[d] the constructive feedback" and would "work on areas of opportunity addressed." (*Id*.).

On September 8, 2020, Plaintiff applied for intermittent leave under the Family Medical Leave Act ("FMLA"). (Def. SOF ¶ 45; Pl. SOF ¶¶ 82, 83; Doc. No. 41-17). Plaintiff was granted the FMLA leave he requested. (Def. SOF ¶ 47). He informed LaRoche of his request for FMLA leave and the reason for the request. (Def. SOF ¶ 46; Pl. SOF ¶ 83). LaRoche was sympathetic but expressed concern about Plaintiff's ability to "get things done" if he planned to be out of the office regularly. (Pl. Dep. at 172).

Less than a week later, on September 14, 2020, LaRoche issued Plaintiff another written reprimand.[5] (Def. SOF ¶ 48; Doc. No. 41-18). The reprimand raised concerns with Plaintiff's handling of the Insurance Broker RFQ Process and Plaintiff's email response to her request for

---

[5] In referring to the September 14, 2020 Memorandum as a "written reprimand," the Court adopts the parties' terminology. The document is a Memorandum with the subject line "Re: Written Warning – Insurance Broker RFQ Process." (*See* Doc. No. 41-18).

additional information on August 17, 2020. (Def. SOF ¶ 48; Doc. No. 41-18). The reprimand states that "[Plaintiff's] response does not contain the level of detail necessary for [her] to discuss with [the] CEO and is generally very vague in nature." (Doc. No. 41-18). The reprimand concludes, "Any further breaches of our confidences in your ability to carry out your expected managerial duties will result in additional discipline, up to and including the possibility of employment termination." (*Id*.). LaRoche testified that she planned to give the reprimand letter on September 8, 2020, the day Plaintiff told her about his need for FMLA leave, but decided to wait to give it to him out of consideration for his family circumstance. (LaRoche Dep. at 179-80).

On September 22, 2020, Plaintiff provided a written response to the September reprimand. (Def. SOF ¶ 55). The first four pages of Plaintiff's six-and-a-half-page, single-spaced response is a point-by-point response to each item raised in the warning. (*See* Doc. No. 41-19). On pages five through seven, Plaintiff expressed dissatisfaction with his treatment by MNAA leadership, describing it as "unfair," "inequitable," "discriminatory", disrespect[ful], "slander[ous]," hostile, and retaliatory, and stated that the "constant harassment, bullying, and hostility" were "dehumanizing." In at least two places, Plaintiff mentioned that he is a "Black professional." (*Id*.).

Plaintiff and LaRoche discussed his response at a subsequent meeting. (Pl. SOF ¶ 93). At the meeting, LaRoche again told Plaintiff she felt like he was "calling her racist."[6] (Pl. SOF ¶ 94; Pl. Dep. at 229-31).

Plaintiff states that LaRoche and Kreulen thereafter subjected him to "increased levels of disparate job scrutiny; concocted criticisms of a baseless nature; micromanagement to a harassing level; [and] hostile in-person communications on a constant basis from Kreulan and LaRoche." (Pl. Decl. ¶ 55).

---

[6] For purposes of summary judgment Plaintiff's version of events is accepted. However, LaRoche denies ever saying making such a comment. (LaRoche Dep. at 87).

On October 19, 2020, Plaintiff met with Human Resources Manager Chandra Starks and presented her with what he described as a "hypothetical." (Pl. SOF ¶ 101). Starks drafted a memorandum documenting their conversation and sent it to LaRoche. (*See* Doc. No. 41-21). The memorandum states that Plaintiff asked "a hypothetical question i.e., 'What should an employee do if they wanted to file a complaint against their supervisor?'" (*Id.*). Starks stated that she "felt as though th[e] conversation was more personal than hypothetical" and that Plaintiff shared "some of the things he was going through." (*Id.*). These included: (1) that he was repeatedly being written up without merit; (2) his supervisor did not appear to listen to him; (3) he was told he could not attend board meetings unless presenting even though other AVPs were allowed to do so; (4) he was misled in the interview process and promises made were not kept; (5) Karisse Spray was "aware of a lot of things going on and nothing was done." (*Id.*). Plaintiff told Starks that when he interviewed with MNAA he raised concerns that the airport was not "racially friendly" and had "leadership issues." (*Id.*). He also asked several VPs whether MNAA would "keep the promise of his standing up the Risk Management Function" and they answered that they would. (*Id.*).

According to Starks's memorandum, she informed Plaintiff that normally an employee would talk to "management, chain of command, and [] HR" and that some employees chose to go to the legal department when other avenues were not available. (*Id.*). At the close of the conversation, Plaintiff reiterated that "this was a hypothetical situation and not him." (*Id.*). Starks told Plaintiff that she would "escalate up the chain to see if there was another 'hypothetical' option for the individual, but was comfortable saying that the person should have a conversation with management, chain of command, HR, Legal, or an outside agency." (*Id.*). Starks then explained, "I didn't exactly say it, but meant EEOC … I felt confident that he knew what agency I was referencing during this conversation." (*Id.*).

LaRoche received Starks's memorandum on October 20, 2020. (Pl. SOF ¶ 118). She did not initiate an investigation or the grievance process, but less than thirty minutes later she exchanged emails with outside counsel with the subject: "MNAA Talking Points Ed McDonald." (Pl. SOF ¶ 119, 121). Later that evening, she emailed Kreulen a document described as "the timeline for the major issues with Ed over the past year." (Pl. SOF ¶ 123; Doc. No. 41-23). The next day, October 21, 2020, outside counsel sent LaRoche a document titled "Edward McDonald Severance Agreement." (Pl. SOF ¶ 125). LaRoche then scheduled a meeting with Plaintiff for the following morning. (Pl. SOF ¶ 126).

At the meeting on October 22, 2020, Plaintiff was terminated. (Pl. SOF ¶ 132). LaRoche told Plaintiff the termination was not performance based and that he was being terminated because he did not "fit with their 'expectations'" and was "not a cultural fit." LaRoche told Plaintiff that MNAA was "moving on" because she "had some communication with Chandra [Starks] … I'm really concerned that you view me as a racist or think I'm being racist."[7] (Pl. SOF ¶ 133; Pl. Decl. ¶ 66). LaRoche later testified that she had conversations with Kreulen about terminating Plaintiff as early as September 2020. (Def. SOF ¶ 65 (citing LaRoche Dep. (Day 2) at 232-33)).

On October 30, 2020, MNAA retained Robert Davidson of Davidson Risk Consulting to perform the risk management functions that Plaintiff had performed. (Pl. SOF ¶ 134; Doc. No. 41-28). Davidson works as a consultant; he is not an MNAA employee. (Doc. No. 41-28; Davidson Dep. at 37-38). MNAA later hired Valeria Hamilton as MNAA Risk Manager. (Pl. SOF ¶ 139). Davidson and Hamilton are both white. (Pl. SOF ¶ 140).

---

[7] For purposes of summary judgment Plaintiff's version of events is accepted. However, LaRoche denies ever saying making such a comment. (LaRoche Dep. at 87). In addition, The Court notes that Plaintiff's deposition testimony concerning what LaRoche said during the termination meeting is slightly different, though not necessarily inconsistent with his declaration. (Compare Pl. Decl. ¶ 66 with Pl. Dep. at 175). During his deposition, Plaintiff testified to LaRoche's statement without using the word "because" to link her concern that he viewed her as racist as reason for his termination. (*See* Pl. Dep. at 175).

10

Plaintiff brings claims for retaliation, discrimination, and hostile work environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.,* the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101 *et seq.*, and 42 U.S.C. § 1981. He also brings a claim for retaliation under the FMLA, 29 U.S.C. § 2601. Defendant seeks summary judgment on all claims.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the nonmoving party's claims. *Id.*

In evaluating a motion for summary judgment, the Court views the facts in the light most favorable for the nonmoving party and draws all reasonable inferences in favor of the nonmoving party. *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 242 (6th Cir. 2015); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003). The Court does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Rather, the Court determines whether sufficient evidence has been presented to make the issue of material fact a proper jury question. *Id*. The mere scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary judgment; instead, there must be evidence from which the jury could reasonably find for the nonmoving party. *Rodgers*, 344 F.3d at 595.

11

## III.    ANALYSIS

### A. Plaintiff's Declaration

Defendant argues the Court should "strike and disregard" Plaintiff's entire declaration because it: "(1) contradicts or mischaracterizes record evidence and/or Plaintiff's sworn testimony; (2) contains inadmissible hearsay and/or overly broad assertions of 'fact;' and (3) in large part, consists of argument as opposed to facts, apparently designed to evade the Court's 25-page limit on briefs." (Doc. No. 46 at 2). Defendant gives four examples of statements in Plaintiff's Declaration that "directly contradict [Plaintiff's] sworn deposition testimony and/or mischaracterize documents in the record." (*Id*.). MNAA states that these examples are "not intended as an exhaustive listing." (*Id*.).

To the extent MNAA invites the Court to scrutinize the 71 paragraphs of Plaintiff's Declaration to determine whether they should be disregarded for one or more of the reasons identified, the Court declines to do so. Nor will the Court strike the entire Declaration on grounds that it contains certain statements that are not appropriate for consideration. The Court will, however, consider whether the four specific statements identified by MNAA as problematic should be disregarded. Those statements are: (1) Plaintiff's claim that MNAA promised to provide him staff support and resources (¶¶ 6, 35); (2) a summary of text conversations between Plaintiff and his wife (¶ 32); (3) speculation that Chandra Starks was aware that a "hypothetical" discussion was "100% related to [Plaintiff's] personal situation" (¶ 62); and (4) reference to MNAA's Organizational Chart "[w]ithout any attachment" and "the legal assertion that he was subjected to less favorable job scrutiny, harassment and other discriminatory treatment when compared to his white professional 'peers.'" (¶ 10).

The first two statements are not material to the Court's analysis and have not been relied upon. The Court also has not relied upon Plaintiff's statement in paragraph 62 because the substance of the meeting between Plaintiff and Starks was documented in Starks's Memorandum. (Doc. No. 41-11). Finally, the Court does not attribute legal meaning to Plaintiff's statement that Kreulen and LaRoche subjected Plaintiff to "less favorable job scrutiny, harassment, and otherwise discriminatory treatment when compared to [his] Caucasian professional peers." It's true that the terms "harassment" and "discriminatory treatment" have legal meaning, but they are also words with non-legal use. To the extent Plaintiff intended to state legal conclusions, they have been disregarded.

## B.    Race Discrimination

Plaintiff brings claims of race discrimination under federal and state law – Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e–2(a)(1); 42 U.S.C. § 1981(a) ("Section 1981"); and the Tennessee Human Rights Act ("THRA"), Tenn Code Ann. § 4-21-101, et seq. Each of these statutes prohibit race discrimination in employment and prohibit retaliation for raising complaints of race discrimination. Courts review Title VII, Section 1981, and THRA race discrimination claims under the same standard. *Forrest v. CSX Transportation, Inc.*, No. 3:22-cv-00039, 2025 WL 337995, at *8 (M.D. Tenn. Jan. 29, 2025); *Goree v. United Parcel Svs., Inc.*, 490 S.W.3d 413 (Tenn. Ct. App. 2015).

A plaintiff may bring a race discrimination claim alleging that either (1) an employer engaged in "discrete discriminatory acts" such as "termination, failure to promote, denial of transfer, or refusal to hire"; or (2) the employer's "repeated conduct" created a hostile work environment. *Ogbonna-McGruder v. Austin Peay State Univ.*, 91 F.4th 833, 840 (6th Cir.), *cert. denied*, 144 S. Ct. 2689 (2024) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–

13

15 (2002); *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 993–94 (6th Cir. 2009)). Here, Plaintiff brings claims under each theory. Plaintiff claims MNAA discriminated against him on the basis of race through a series of actions that created a hostile work environment and when it terminated him because he was "not on the same page as to [MNAA's] goals and vision for [his] position" and "not a fit." (*See* Doc. No. 36 at 21-22). The Court considers each in turn beginning with termination.

    1.  <u>Termination</u>

Plaintiff relies on circumstantial evidence to support his claims of race discrimination. Accordingly, the Court applies the *McDonnell Douglas* burden-shifting framework to evaluate his claims. *Moore v. Coca-Cola Bottling Co*., 113 F. 4th 608, 622 (6ᵗʰ Cir. 2024) (citing *Clay v. United Parcel Serv., Inc*., 501 F.3d 695, 703 (6th Cir. 2007)). To survive summary judgment, Plaintiff first must "sufficiently show that he [ ] suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination." *Id*. (internal citations and quotation omitted). To make out this prima facie case, Plaintiff must "show that he was (1) a member of a protected class, (2) subject to an adverse employment action, (3) qualified for the position, and (4) replaced by a person outside the protected class or treated differently than similarly situated nonminority employees." *Id*. (citing *Tennial v. United Parcel Serv., Inc*., 840 F.3d 292, 303 (6th Cir. 2016)). If Plaintiff makes out a prima facie case, the burden then shifts to MNAA to proffer a non-discriminatory reason for its actions. *Id*. at 623. If MNAA articulates a legitimate and nondiscriminatory reason for its actions, the burden shifts back to Plaintiff "to show that the reason[s] put forth by the defendant [are] pretextual." *Id*.

MNAA argues it is entitled to summary judgment on Plaintiff's race discrimination claims arising out of his termination because Plaintiff cannot establish the fourth element of a prima facie

case – that he was treated differently than similarly situated nonminority employees or was replaced by someone outside his class. In support of their argument as to element four, MNAA points to evidence that Plaintiff's specific position was not filled after his termination; instead, his duties were outsourced to a private risk management firm – Davidson Risk Consulting. (Doc. No. 34 at 11 (citing Def. SOF ¶ 77)). MNAA also contends there were no "similarly situated nonminority employees" at MNAA because "all the AVPs who reported to Plaintiff's supervisor, Gale LaRoche, were also black." (*Id*. at 10 (citing Def. SOF ¶¶ 13-17)).

Plaintiff responds that although Robert Davidson of Davidson Risk Consulting was hired as a consultant rather than an employee, there is no dispute that Davidson, who is white, assumed the risk management job functions formerly performed by Plaintiff. (Doc. No. 36 at 15 (citing Pl. SOF ¶¶ 134, 140; Doc. No. 41-28)). To the extent MNAA claims Valerie Hamilton assumed the role previously held by Plaintiff, Hamilton is also white. (*See* Pl. SOF ¶¶ 139, 140). Plaintiff also points to evidence – largely based on his own declaration – that he was treated differently than his "white professional peers."

Element four requires that Plaintiff establish he was replaced by someone outside the protected class *or* treated differently that similarly situated employees. Plaintiff has provided evidence to show that he was replaced by someone outside the protected class. Therefore, this element is satisfied. The Court need not consider Plaintiff's argument that he was also treated differently that his "white professional peers."

MNAA does not dispute that Plaintiff has established a prima facie claim of discrimination as to the remaining elements. The burden then shifts to MNAA to provide a legitimate, non-discriminatory reason for Plaintiff's termination. In order to meet its burden to provide a

legitimate, non-discriminatory reason for Plaintiff's termination, MNAA "must clearly set forth ... the reasons for its decision." *Moore*, 113 F.4th at 623 (internal quotation and citation omitted).

MNAA states that it terminated Plaintiff based on "his failure to meet MNAA's expectations for the AVP, Risk Management role." (Doc. No. 34 at 11). "Despite MNAA expressing their goals and direction on how they wanted the job performed to Plaintiff, Plaintiff responded to coaching efforts as to how he should perform his duties by detailing why MNAA in his view was wrong instead of showing progress – demonstrating Plaintiff's 'chart my own course because I am smarter than you' approach to his job." (*Id.* (citing Def. SOF ¶¶ 23, 32, 55)). Defendant contends "poor performance" is a legitimate, non-discriminatory reason for terminating a person's employment. (*Id.* (citing *Parks v. UPS Supply Chain Solutions, Inc.*, 607 F. App'x 508, 514 (6th Cir. 2015)).

Because MNAA has proffered a non-discriminatory reason for Plaintiff's termination, the burden then shifts to Plaintiff to provide evidence that MNAA's proffered reason is pretextual. "At the summary-judgment stage, showing that a proffered reason is insufficient requires the employee to show that a reasonable factfinder could find that the [employer's] proffered reason was insufficient to motivate the employee's discharge." *Moore*, 113 F.4th at 623 (citing *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 676 (6th Cir. 2008) (cleaned up). Plaintiff can demonstrate pretext by showing "that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Moore*, 113 F.4th at 623 (quoting *Clay v. United Parcel Serv.*, 501 F.3d 695, 704 (6th Cir. 2007)).

Plaintiff points to MNAA's changing justification for termination, noting that LaRoche did not raise any specific performance issues as grounds for termination at the time. (Doc. No. 36 at

16

21). Instead, Plaintiff claims that when he was terminated LaRoche told him the termination had nothing to do with his professionalism or industry knowledge, and never said that the termination was performance based. (Pl. Dep. at 175). Instead, she told him that he was bring terminated because he was "not a cultural fit" for the organization. (*Id*.). Plaintiff claims LaRoche also expressed "concern[s] that [he] viewed [her] as racist." (*Id*.). Finally, Plaintiff argues that he alleged performance issues are themselves without merit, pointing to evidence that an attendance issue identified in the February 2020 letter of reprimand is demonstrably false, and that complaints about other performance issues were similarly meritless. (Doc. No. 36 at 21).

Whatever MNAA's justification for Plaintiff's termination, there are factual disputes concerning the reasons given during the October 22, 2020, meeting. Viewing the facts in the light most favorable to Plaintiff, MNAA's reason for his termination has changed or at least been fortified. Changing reasons for termination can support an inference that MNAA's current proffered justification is pretextual. *See Cicero v. Borg-Warner Auto, Inc*., 280 F.3d 579, 592 (6th Cir. 2002). Plaintiff has presented sufficient evidence of pretext for a jury to conclude the proffered reasons – *i.e*., that Plaintiff was "not a good fit" or for performance issues – was pretext for discrimination. Accordingly, MNAA's motion for summary judgment as to Plaintiff's race discrimination claims arising out of his termination will be denied.

2.  Hostile Work Environment

Defendant also claims MNAA engaged in racially motivated harassing conduct that created a hostile work environment. "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *McNeal v. City of Blue Ash, Ohio*, 117 F.4th 887, 897 (6th Cir. 2024) (quoting *Oncale v. Sundowner Offshore Servs.,*

*Inc.*, 523 U.S. 75, 78 (1998). To prove a claim of discrimination based on a hostile work environment, Plaintiff must establish that: (1) he is a member of a protected class; (2) he was subjected to harassment; (3) the harassment was based on his protected status; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take action. *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 482 (6th Cir. 2020). "A hostile work environment claim is 'based on the cumulative effect of individual acts' occurring over the span of weeks, months, or years." *McNeal v. City of Blue Ash, Ohio*, 117 F.4th 887, 902 (6th Cir. 2024) (citing *Nat'l R.R. Corp. v. Morgan*, 536 U.S. 101, 115 (2002)). Plaintiff must show that the work environment produced "some harm respecting an identifiable term or condition of employment." *Id.* at 904 (citing *Muldrow*, 601 U.S. at 355).

"Whether harassment is sufficiently severe or pervasive to create an abusive work environment is 'quintessentially a question of fact.'" *Id.* (citing *Crawford*, 96 F.3d at 835-36). Courts consider the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 778-88 (1988)).

MNAA argues Plaintiff cannot show that any alleged harassment was based on race because Plaintiff never heard anyone at MNAA use a racial slur. (Doc. No. 34 at 13 (citing Pl. Dep. at 59-60)). MNAA further argues that "[e]ven if Plaintiff could point to a single offensive comment, it would not be sufficiently severe or pervasive to rise to the threshold required to establish a hostile work environment." (Doc. No. 34 at 13-14).

MNAA fails to show summary judgment should be granted as to Plaintiff's racial discrimination hostile work environment claim. Plaintiff's claim is not based on the use of racial

slurs, but on an alleged pattern of conduct he contends created a hostile work environment and altered the terms and conditions of his employment. These include limitations on remote work, restrictions on attending board meetings, denial of requests for staff and resources, micromanagement, increased job scrutiny, unjustified written reprimands, and being spoken to in a condescending, hostile, and unprofessional manner. (*See* Doc. No. 36 at 22). Plaintiff states that his "white professional peers" were not subjected to the same treatment. (*Id.*).

Next, Defendant disputes the factual basis of Plaintiff's hostile work environment claim and the conclusion that the alleged conduct was sufficient to create a hostile work environment. These factual disputes cannot be resolved at this stage of the case. Construing the facts in the light most favorable to Plaintiff, a reasonable jury could find that the conduct occurred as described by Plaintiff, and that such conduct was based on race because non-minority professionals were not subjected to the same treatment, and that the cumulative effect of these individual acts resulted in Plaintiff being unable to perform his job and thereby negatively altered the terms and conditions of his employment. MNAA's motion for summary judgment on the claim for racial discrimination – hostile work environment will be denied.

## C. Retaliation

Plaintiff claims MNAA retaliated against him after he engaged in protected activity by subjecting him to increased scrutiny, issuing unjustified written reprimands, and ultimately ending his employment. He brings retaliation claims under Title VII, THRA, 42 U.S.C. § 1981, and the FMLA. Courts review retaliation claims under Title VII, THRA, 42 U.S.C. § 1981, and the FMLA under the same standard. Wyatt v. Nissan N. Am., Inc., 999 F.3d 200, 419 (6th Cir. 2021). *Forrest v. CSX Transportation, Inc.*, No. 3:22-cv-00039, 2025 WL 337995, at *10 (M.D. Tenn. Jan. 29,

19

2025) (citing *Boxill v. O'Grady*, 935 F.3d 510, 520 (6th Cir. 2019); *Goree v. United Parcel Svs., Inc.*, 490 S.W.3d 413 (Tenn. Ct. App. 2015).

As with discrimination claims, the applicable framework depends on whether the plaintiff relies on direct or circumstantial evidence of a retaliatory motive. "Direct evidence is that evidence which, if believed, requires the conclusion that unlawful retaliation was a motivating factor in the employer's action." *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003). Circumstantial evidence, on the other hand, is proof that does not on its face establish retaliatory animus, but allows a factfinder to draw a "reasonable inference" that retaliation occurred. *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 649 (6th Cir. 2012).

"Where a Plaintiff relies on direct evidence of retaliation, the employer must show by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Young v. Bernard MMC, LLC*, 602 F. Supp. 3d 1065, 1070 (M.D. Tenn. 2022). Claims based on circumstantial evidence of retaliation are evaluated using the *McDonnell-Douglas* burden shifting framework discussed above. *See supra*, III.B.1.

   1. <u>Retaliation for Complaints of Race Discrimination</u>

Plaintiff argues there is direct evidence that he was terminated in retaliation for making complaints of race discrimination. He points to his Declaration in which he states that during the termination meeting LaRoche told him "MNAA was moving on *because*: 'Well, I had some communication with Chandra … I'm really concerned that you view me as a racist or think I'm being racist.'" (Pl. Decl. ¶ 66) (emphasis added). MNAA responds to Plaintiff's argument concerning direct evidence by addressing different evidence than that cited by Plaintiff. (*See* Doc. No. 46 at 3 (arguing that the statement that Plaintiff was not a "cultural fit for the organization" is not direct evidence of discrimination or retaliation).

The Court notes that Plaintiff's deposition testimony concerning what LaRoche said during the termination meeting is slightly different, though not necessarily inconsistent, from his declaration. During his deposition, Plaintiff testified to LaRoche's statement without using the word "because" to link her concern that he viewed her as racist as reason for his termination. (*See* Pl. Dep. at 175). Whatever the precise wording, LaRoche denies having made any such statement. (*see* LaRoche Dep. (Day 1) at 87). Ultimately, the Court need not decide whether LaRoche's statement during the meeting is direct evidence of retaliation because Plaintiff unquestionably also presents circumstantial evidence of retaliation and, as discussed below, the retaliation claims survive summary judgment under the burden shifting framework.

To state a prima facie claim of retaliation under each of Plaintiff's statutory claims, Plaintiff must establish that: (1) he engaged in activity protected by the respective statute; (2) MNAA was aware of the protected activity; (3) MNAA subsequently took an action that was materially adverse to Plaintiff; and (4) there was a causal connection between the protected activity and the materially adverse action. *Funk v. City of Lansing, Michigan*, 821 F. App'x 574, 582 (6th Cir. 2020). "The burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *Id.* (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)).

MNAA argues Plaintiff cannot establish a prima facie case of retaliation related to complaints of race discrimination because he did not engage in legally protected activity and cannot show his termination was causally connected to his complaints of race discrimination – the first and fourth elements. MNAA does not dispute that Plaintiff has established the second and third elements – that it was aware of Defendant's protected conduct and subsequently took adverse action against him.

"[C]omplaining about discriminatory treatment is a protected activity." *Young v. Bernhard MCC, LLC*, 602 F. Supp. 3d 1065, 1069 (M.D. Tenn. 2022)(internal quotations omitted)(citing *Eades v. Brookdale Senior Living, Inc.*, 401 F. App'x 8, 10 (6th Cir. 2010)). Plaintiff claims he made complaints of racial discrimination on the following occasions: (1) in January 2020, he complained to AVP of HR Karisse Spray about "racial issues" and "feeling discriminated against"; (2) in his March 2020 response to a letter of reprimand, he complained about "unfair and disparate opportunities to be successful"; (3) in his September 2020 response to a letter of reprimand, he reported discrimination and other inequitable employment opportunities; and (4) on October 19, 2020, he met with HR Manager Chandra Starks, complained of race and discussed HR reporting options. (Doc. No. 36 at 17-18).

MNAA argues Plaintiff did not engage in protected activity when he spoke to Chandra Starks because he presented his complaint as a hypothetical. (Doc. No. 34 at 18). MNAA also contends that the complaints raised in Plaintiffs responses to the written reprimands are not protected activity "because they were contesting the correctness of his written reprimands rather than asserting discrimination." (Doc. No. 46 at 5).

As an initial matter, MNAA has not addressed Plaintiff's claim that he complained of race discrimination to Karisse Spray in January 2020. This complaint alone satisfies the first element. With regard to the other identified protected conduct, viewed in the light most favorable to Plaintiff, the responses to the letters of reprimand raise complaints of discrimination and, therefore, constitute protected activity. MNAA's insistence that the responses to the letters of reprimand address nothing other than the "correctness of the reprimands" ignores the portions of the responses that raise allegations of inequitable treatment, unfairness, harassment, bullying, hostility, and retaliation. (*See* Doc. Nos. 41-14, 41-19).

22

Even if Plaintiff's complaints within the responses to the letters of reprimand are insufficiently specific to constitute protected activity, there is no question that his meeting with Chandra Starks days before his termination qualifies. Chandra Starks's memorandum to LaRoche indicates that although Plaintiff presented his complaints as a hypothetical, it was apparent that he was talking about himself. (*See* Doc. No. 41-11 (reporting that Plaintiff "began sharing some things he was going through")). They discussed him "bring[ing] charges against the company" and Plaintiff expressed concern that "he could be perceived as being petty to bring charges against the company after the fact and it would almost be like career suicide … [and] if he filed a complaint while still here, he was pretty sure he would receive polished retaliation." (*Id*.). In summary, the Court finds Plaintiff has established the first element of a prima facie case – that he engaged in protected conduct.

MNAA next argues that Plaintiff cannot establish the fourth element – causation – because Starks and LaRoche did not regard Plaintiff's statements to Starks as a complaint of discrimination and because the decision to terminate Plaintiff "was undisputedly made prior to Plaintiff's October hypothetical to Starks." (Doc. No. 46 at 6 (citing LaRoche Dep. (Day 2) at 232)). LaRoche testified that she decided to fire Plaintiff after "that last meeting that he had with Ed, when he updated us on insurance issues, [ ] at that point I knew that we just could not continue with his employment." (LaRoche Dep. (Day 2) at 233).

Given the temporal proximity between Plaintiff's meeting with Starks on October 19, 2020, and his termination on October 22, 2020, a reasonable jury could disbelieve LaRoche's testimony that the decision had been made months earlier. *See Imwalle v. Reliance Med. Products, Inc*., 515 F.3d 531, 550 (6th Cir. 2008) (temporal proximity supports an inference of causation). Moreover, as discussed above, Plaintiff's meeting on October 19, 2020, was not the only time he raised

23

concerns of racial discrimination. Plaintiff claims he raised these complaints as early as January 2020 and several times thereafter. Drawing all reasonable inferences in Plaintiff's favor, the Court finds Plaintiff has presented evidence of a causal connection between his protected activity and his termination.

MNAA also argues that Plaintiff's retaliation claim fails because it had a legitimate non-discriminatory reason to terminate him and Plaintiff cannot show pretext. The parties' arguments here are the same as those presented with regard to Plaintiff's claim of race discrimination. For the reasons stated above, a reasonable jury could find that MNAA's proffered reason for termination was pretext for retaliation. Accordingly, summary judgment on Plaintiff's claim that he was terminated in retaliation for making complaints of race discrimination will be denied.

2. FMLA Retaliation

Plaintiff requested FMLA leave on September 8, 2020. Plaintiff claims that MNAA responded to the FMLA leave request by questioning Plaintiff's ability to "get things done" at MNAA if he used FMLA leave regularly, issuing Plaintiff a written reprimand on September 14, 2020, concerning issues that arose approximately one month earlier that were not raised at that time, and terminating Plaintiff approximately six-weeks after his request for FMLA leave.[8] (Doc. No. 36 at 18).

---

[8] Plaintiff identifies additional adverse action after the date of his FMLA request, but indicates that those actions were in response to the September Response and Grievance and his complaints to Starks on October 19, 2020. (*See* Doc. No. 36 at 18-19). Although Plaintiff brings separate claims for FLMA retaliation and retaliation based on his complaints of race discrimination, Plaintiff's response to MNAA's motion for summary judgment lumps all of the retaliation claims together without differentiating between conduct he claims is retaliation for his complaints of race discrimination and retaliation based on his request for FMLA leave. Of course, it is possible that MNAA's conduct was motivated by retaliatory animus arising out of both categories of protected conduct, but Plaintiff has muddied his theory by combining both retaliation claims into a single argument. For purposes of the motion for summary judgment, the Court considers the actions specifically identified by Plaintiff as related to the FMLA request. Because the Court finds Plaintiff's claim survives summary judgment based on these adverse actions, it need not consider whether other actions may plausibly be connected to conduct protected under the FMLA.

24

MNAA argues Plaintiff cannot establish a prima facie claim for FMLA retaliation because he cannot establish elements three and four – adverse action and causation. MNAA does not dispute that Plaintiff satisfied elements one and two – that he engaged in conduct protected by the FLMA by making a request for FMLA leave and that MNAA knew about the protected conduct.

MNAA argues that Plaintiff fails to satisfy the third element – materially adverse action – because the written reprimand issued on September 14, 2020, is not an adverse employment action.[9] (Doc. No. 34 at 14). But the Supreme Court has made clear that an adverse employment action is not required. *Burlington Northern and & Santa Fe Railroad Co. v. White*, 548 U.S. 53 (2006). Instead, an action is "materially adverse" in the retaliation context if it "could well dissuade a reasonable worker" from exercising his rights. *Id*. Although *Burlington* concerned a retaliation claim under Title VII, the Sixth Circuit has made clear that this standard also applies to retaliation claims under the FMLA. *See Chapman v. Brentlinger Enter.*, 124 F.4th 382, 403 (6th Cir. 2024).

A reasonable jury could conclude that a written reprimand would dissuade a reasonable worker from exercising his rights. This is particularly the case here where the reprimand advises that "[a]ny further breaches of our confidence in your ability carry out your expected managerial duties will result in additional discipline, up to and including the possibility of employment termination." (*See* Doc. No. 41-18).

Next, MNAA argues that Plaintiff cannot establish causation – element four – because he has no "compelling or circumstantial evidence" that the September 14, 2020, written reprimand is "in any way related to his FMLA leave." (Doc. No. 34 at 16). As evidence of the lack of causation, MNAA points to the "multiple written reprimands dealing with [Plaintiff's] failure to meet MNAA

---

[9]     The Court notes that Plaintiff also claims his termination is an adverse action causally connected to protected activity under the FMLA. MNAA does not address this aspect of his claim.

expectations for his role prior to him taking FMLA leave." (Id. (citing Def. SOF ¶¶ 21, 31, 33)). MNAA also argues that LaRoche prepared the reprimand earlier and planned to give it to Plaintiff on September 8, 2020, the day he requested FMLA leave, but postponed presenting the reprimand because of Plaintiff's daughter's health concern. (*Id*. (citing Def. SOF ¶ 49)). Defendant acknowledges that the reprimand was issued shortly after Plaintiff requested FMLA leave, but argues that "temporal proximity alone in the absence of other direct or compelling circumstantial evidence is generally not sufficient to support a finding of causal connection." (*Id*. (citing *Barrett v. Lucent Tech., Inc*., 36 F. App'x 835, 843 (6th Cir. 2002)).

MNAA's argument is uncompelling. First, the temporal proximity – less than one week – between Plaintiff's request for FMLA leave and the reprimand letter is "very close." *See Barrett*, 36 F. App'x at 843 (stating that absent additional evidence, temporal proximity establishes a prima facie case only if it is "very close"). Moreover, here, Plaintiff does not rely on temporal proximity alone. He points to LaRoche's negative comments about his ability to "get things done" if he planned to use FLMA leave regularly. (Doc. No. 36 at 20). Plaintiff also argues that the temporal distance between the subject of the reprimand letter – an email on August 17, 2020 – and the issuance of the reprimand almost a month later suggests the reprimand was causally connected to his request for FMLA leave. (*Id*. at 19). Accordingly, Plaintiff has established at causal connection for purposes of a prima facie case.

Under the *McDonnell-Douglas* burden shifting framework, the burden shifts to MNAA to provide a legitimate, non-retaliatory reason for the adverse action. Again, MNAA only specifically addresses the September 14, 2020, written reprimand. MNAA states that it issued the reprimand due to Plaintiff's "continued failure to meet MNAA's expectations for the AVP, Risk Management

role." (Doc. No. 34 at 17). In addition, the reprimand itself thoroughly explains the reasons it was issued. (*See* Doc. No. 41-18).

Under the *McDonnell-Doulas* framework, the burden then shifts back to Plaintiff to show that MNAA's reason for issuing the reprimand is pretext for retaliation. As evidence of pretext Plaintiff again points to the close temporal proximity to his FMLA leave request and the fact that weeks passed between the conduct complained of in the reprimand and the reprimand was not issued until after Plaintiff sought FMLA leave. Plaintiff also contends that the subject addressed in the reprimand – an insufficiently detailed email – would have been more appropriately addressed by a contemporaneous request for more information. Plaintiff argues that the fact that MNAA opted instead to issue a written reprimand concerning the need for more information and only did so after Plaintiff requested FMLA leave suggests that the proffered reason was pretextual.

A reasonable jury could find that MNAA's proffered non-retaliatory reason for issuing the September 14, 2020 reprimand was pretextual. MNAA does not address the termination in the context of Plaintiff's FMLA retaliation claim. MNAA's motion for summary judgment on Plaintiff's claim for FMLA retaliation will be denied.

3. Retaliatory Hostile Work Environment

In addition to his claim for hostile work environment based on race, Plaintiff brings a claim for retaliatory hostile work environment under Title VII, Section 1981, and THRA. (*See* Am. Compl., Doc. No. 6). MNAA's motion for summary judgment did not address this claim in its memorandum or reply. (*See* Doc. Nos. 34, 46). Accordingly, the retaliatory hostile work environment claim will proceed to trial.

27

## IV. CONCLUSION

For the reasons stated, MNAA's Motion for Summary Judgment (Doc. No. 33) is **DENIED**. An appropriate Order shall enter.

WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE